# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**UNITED STATES OF AMERICA,**
      **Plaintiff,**

    **v.**                             **Case No. 03-CR-46**

**FAWZIYEH RAKI MASOUD,**
      **Defendant.**

---

## DECISION AND ORDER

Defendant Fawziyeh Raki Masoud petitions for a writ of error coram nobis, seeking to avoid the deportation order issued based on her wire fraud conviction in this case. Defendant argues that her lawyer provided ineffective assistance of counsel by failing to properly advise her of the immigration consequences of pleading guilty to the charge. I held an evidentiary hearing on the petition, which I now deny.

## I. FACTS AND BACKGROUND

### A.    The Underlying Case

On May 13, 2005, pursuant to an agreement with the government, defendant pleaded guilty to wire fraud, contrary to 18 U.S.C. § 1343, arising out of her participation in a scheme concocted by a man named Abdel Jebara to fraudulently redeem coupons. Jebara recruited various individuals to collect and cut coupons from newspaper inserts. He and other co-conspirators then enlisted more than 300 "stores" to fraudulently redeem the coupons, which had not actually been presented by customers making a purchase. Due to the volume of coupons redeemed in the United States, manufacturers rely on "clearinghouses" to sort them and provide reimbursements. Assisted by an insider at one of the clearinghouses, who

approved the fraudulent reimbursement applications, Jebara bilked hundreds companies out of more than $5,000,000. Defendant's role in the scheme was to cut and weigh coupons, which were then picked up by other scheme participants. She was paid a small amount per pound.

The parties agreed to a loss amount of $120,000 for defendant under U.S.S.G. § 2B1.1(b) and a sentencing guideline range of 10-16 months' imprisonment. Nevertheless, for a variety of reasons, including her role in the offense, her lack of prior record, her unsophisticated nature, and her serious health problems, the parties jointly recommended a sentence of 3 years' probation. On August 11, 2005, I sentenced defendant to the recommended probationary term. Defendant took no appeal and successfully completed probation.

## B.   The Instant Motion

On July 20, 2011, defendant filed a motion to set aside her conviction, in which she indicated that she had been ordered deported by an Immigration Judge based on her wire fraud conviction, which qualified as an "aggravated felony" under 8 U.S.C. § 1101(a)(43)(M). She claimed that she would not have entered her plea had she known that she would be deported. She noted that under Padilla v. Kentucky, 130 S. Ct. 1473 (2010), a lawyer's failure to advise her client of the risk of deportation may constitute ineffective assistance of counsel and argued that her defense lawyer, Jean Kies, failed to ensure that she understood that a consequence of her plea would be removal. She accordingly asked the court to set aside the conviction resulting from her May 13, 2005 guilty plea.

The original motion lacked a stated jurisdictional basis, but I noted that it could be construed as seeking a writ of error coram nobis, see United States v. Orocio, 645 F.3d 630

2

(3d Cir. 2011) (considering a <u>Padilla</u> claim via coram nobis motion), and provided defendant with time to supplement her submission. On August 4, 2011, defendant filed a supplemental motion seeking coram nobis relief, and I ordered the government to respond by August 26. On August 23, 2011, the Seventh Circuit held that <u>Padilla</u> announced a new rule of criminal procedure inapplicable to cases on collateral review. <u>Chaidez v. United States</u>, 655 F.3d 684 (7th Cir. 2011), <u>cert. granted</u>, 132 S. Ct. 2101 (2012). I directed the government to address <u>Chaidez</u> in its response and permitted defendant to file a reply by September 9 addressing the issue.

The government filed its response on August 24, 2011, arguing that the petition should be denied under <u>Chaidez</u>. In the alternative, the government argued that the petition failed on the merits. The government attached to its response an affidavit from Attorney Kies averring that she conferred with an immigration specialist then advised defendant through a bilingual relative that defendant faced removal based on a plea to the charge.

Defendant filed a reply on September 7, arguing that <u>Orocio</u> (which allowed a collateral attack) provided a better reading of <u>Padilla</u> than <u>Chaidez</u>. On September 9 and 14, 2011, defendant filed additional supporting affidavits, including from the bilingual relative, Hasaan Darwish, disputing Kies's version, and from defendant's immigration lawyer, Jonathan Nelson, averring that Kies provided faulty advice. Defendant also filed a supplemental reply brief arguing that <u>Chaidez</u> was distinguishable. I granted defendant's motion for leave to supplement the record with these materials, then permitted the government to file a sur-reply.

In a memorandum issued on January 5, 2012, I indicated that an evidentiary hearing was needed to resolve the petition. I first noted that <u>Chaidez</u> could be distinguished as a case where defense counsel provided <u>no</u> immigration advice, as opposed to the affirmative <u>mis-</u>

3

advice defendant alleged in this case.  The Seventh Circuit held, prior to <u>Padilla</u>, that counsel

had no duty to advise a defendant of collateral matters like deportation.  <u>See, e.g.</u>, <u>Santos v.

Kolb</u>, 880 F.2d 941, 944 (7th Cir. 1989).  However, it was an open issue in this circuit as to

whether the provision of misinformation could support an ineffective assistance claim.  <u>See,

e.g.</u>, <u>Acevedo-Carmona v. Walter</u>, 170 F. Supp. 2d 820, 826 n.1 (N.D. Ill. 2001).  Other circuits

did distinguish, pre-<u>Padilla</u>, between mere silence and affirmative mis-advice about immigration

matters, allowing ineffective assistance claims based on the latter but not the former, <u>see, e.g.</u>,

<u>United States v. Kwan</u>, 407 F.3d 1005, 1015-1017 (9th Cir. 2005); <u>United States v. Couto</u>, 311

F.3d 179, 188 (2d Cir. 2002); <u>Downs-Morgan v. United States</u>, 765 F.2d 1534, 1540-1541 (11th

Cir. 1985), and Justice Alito, in his concurring opinion in <u>Padilla</u>, suggested that this distinction

represented the prevailing view, 130 S. Ct. at 1493-94.  I therefore declined to reject the

petition under <u>Chaidez</u>, as the government requested.[1]  I also noted that the parties disputed

what Kies told defendant and when, and whether defendant would have rejected the plea

agreement and gone to trial had she been "properly" advised.  I therefore held an evidentiary

hearing on March 21, 2012, at which Kies, Darwish, defendant, and Nelson testified.

---

[1]For the sake of clarity, I note that in <u>Padilla</u> defense counsel provided mis-advice, telling his client that he did not have to worry about his immigration status since he had been in the country so long, when in fact the crime made deportation virtually mandatory.  130 S. Ct. at 1478.  However, the Court specifically declined to limit the rule to affirmative mis-advice, as the Solicitor General (and Justices Alito and Roberts) urged.  <u>Id.</u> at 1484-85, 1492-93.  Thus, <u>Padilla</u> applies <u>both</u> to failure to advise and mis-advice about immigration consequences.  I have drawn a distinction between the two in this case because <u>Chaidez</u> declared <u>Padilla</u> to announce a new rule in the context of a failure to advise case.  Given the weight of pre-<u>Padilla</u> case-law, I have assumed that a mis-advice claim does <u>not</u> rely on a new rule.  I further note that on April 30, 2012, the Supreme Court granted certiorari in <u>Chaidez</u>.  However, because I have assumed that claims of the sort defendant raises here may be raised collaterally, there is no need to wait for the Court's decision.

**C.  Hearing Testimony**

**1.  Jean Kies**

Attorney Kies testified that she was appointed to represent defendant in this case through Federal Defender Services.  Kies explained that the case involved a coupon fraud scheme in which defendant and her friend, Anam Manasrah, were accused of cutting the coupons at Manasrah's home.  (Evid. Hr'g Tr. [R. 501] at 4.)  Kies indicated that defendant spoke Arabic, which required her to use an interpreter.  Defendant also had an extremely limited education and had not assimilated to the American lifestyle.  (Id. at 5.)  Kies testified that she communicated with defendant through a family member, Hasaan Darwish, as well as using a court-appointed interpreter to review the pre-sentence report and plea agreement.  (Id. at 5-6.)  Kies indicated that Darwish did not, to her knowledge, have training as an interpreter, although he did speak good English and, due to the cultural concerns, Kies felt that defendant was comfortable in having information relayed through Darwish.  Darwish and defendant both lived in New York City at the time.  (Id. at 6.)

Kies testified that when she first met with defendant (around the time of her initial appearance in December 2004) she became aware that defendant was not a U.S. citizen.  (Id. at 7.)  Kies believed that defendant had a green card, while her husband was a citizen.  (Id. at 7.)  Kies testified that she met with defendant on May 12, 2005, at the offices of Federal Defender Services to review the plea agreement, using a court-appointed interpreter.  (Id. at 8.)  Defendant entered her plea the following day, May 13.  (Id. at 8.)

Kies testified that on March 14, 2005, she sent defendant a letter asking whether defendant was interested in resolving the case short of trial.  (Id. at 8-9; Ex. 1000.)  Kies

testified that prior to the March 14, 2005 letter, she had teleconferences with Darwish on a number of occasions.  (Tr. at 10.)  After reviewing her notes, Kies indicated that she communicated with Darwish by phone on December 13, 2004, December 17, 2004, December 20, 2004, and February 16, 2005; she also met with defendant on December 16 and 17, 2004.  (Id. at 11.)  Kies testified that when she wanted to communicate with defendant by phone she always called Darwish. To her knowledge, Darwish passed along the information; defendant was not present during the calls, with Darwish simultaneously interpreting.  (Id. at 12.)

Kies testified that she included with the March 14, 2005 letter a copy of the proposed plea agreement.  (Id. at 12; Ex. 1002.)  Kies indicated that she had several concerns in negotiating the plea.  First, she noted that it would have been devastating for defendant to go to prison; the plea agreement recommended a non-guideline sentence of probation.  Second, defendant's finances were such that she did not have the wherewithal to pay restitution; the plea agreement did not require her to make restitution.  Third, Kies testified that it was in defendant's best interest to negotiate a deal given defendant's involvement in the fraud.  (Tr. at 13.)

Kies testified that she sent defendant a second letter dated March 21, 2005.  (Id. at 13; Ex. 1001.)  In that letter, Kies followed up on a conversation she had with Darwish on or about March 18, 2005, in which he raised a concern about whether immigration would pull defendant's green card if she entered a plea.  (Tr. at 13-14.)  Kies testified that she also discussed the immigration issue with Attorney Robin Shellow, who represented Manasrah, on or about March 18, 2005.  (Id. at 15.)  This was the first time the immigration issue had been raised as a big concern for defendant.  Kies testified that Darwish seemed to believe that Manasrah had a deal with immigration that she would not be deported, which was worked out

6

in the context of the plea agreement she was going to enter into with the government in this case. (Id. at 16-17.) Kies believed that Darwish wanted for defendant the same kind of deal Manasrah got, although to Kies's understanding Manasrah had no such deal with the government. (Id. at 17.) It was in response to this phone call that Kies contacted Attorney Shellow. Kies's notes indicated that Shellow told her that Manasrah would not be able to leave and re-enter the United States after a fraud conviction because it had been less than five years since the time that she had originally entered the United States. Kies then had some discussion with Shellow about possibly talking to the AUSA about voluntarily dismissing the case and asking their clients to leave the country voluntarily. Kies's notes further indicated that they approached the government regarding the immigration issues but were told that the U.S. Attorney's office could not bind the INS into any agreement related to deportation. Kies testified that she called Darwish and told him this information to relay to defendant the same day. (Id. at 18.)

Kies testified that she did not recall receiving any other information regarding deportation consequences aside from her conversation with Attorney Shellow prior to sending the March 21, 2005 letter. (Id. at 20.) In that letter, Kies indicated that "for persons with a green card to avoid deportation, the crime must have occurred more than five years since his or her last entry into the United States to prevent deportation." (Ex. 1001 at 1.) In the context of the present case, this information was inaccurate. Kies also stated in the letter that, if convicted, defendant would "not be allowed to leave the United States and then re-enter the country." (Ex. 1001 at 1.) This statement was correct.

Kies subsequently contact several immigration specialists to obtain further information. She first contacted Attorney E.J. Hunt, an experienced federal criminal practitioner, seeking a

referral. She then contacted Attorney Tom Hochstatter, who provided immigration law advice. Hochstatter then referred Kies to Attorney Erich Straub, an immigration lawyer who in the past practiced federal criminal defense. Kies left a message for Straub, he got back to her, and they talked about the case. (Id. at 20.) Later, Kies sent defendant's proposed plea agreement to Straub for his review to make sure she was giving proper immigration advice, as she did not practice immigration law. (Id. at 20-21.)

Kies admitted that her March 21, 2005 letter implied that defendant could avoid deportation if more than five years had elapsed between the time she last entered the United States and the date of the alleged fraud. (Id. at 21.) The letter asked defendant to provide the last date that she left and re-entered the United States. The letter also told defendant that if she left the United States she would be barred from re-entry as a result of conviction. (Id. at 21.) The letter further indicated that Kies had approached the AUSA about immigration consequences for defendant. (Id. at 21.) Kies testified that she asked the prosecutor to specifically put a provision in the plea agreement stating that defendant would not be deported based on her plea, but he replied that he could not bind the INS and therefore could not put that in the plea agreement. (Id. at 21-22.) The letter concluded that immigration issues were carefully considered in Manasrah's case, and that the AUSA would also work with defendant if she accepted the plea agreement. (Id. at 22.) Kies testified that one could from this language draw an inference that the government had worked an immigration deal with Manasrah, but she noted that earlier in the letter she clearly stated that the AUSA explained that he could not bind the INS. (Id. at 23.) Kies testified that the AUSA told her only that he would work with defendant to get the best result possible, which referred to a probationary sentence. Kies indicated that if defendant and Manasrah were sentenced to prison, with their

immigration status, the INS would immediately put a hold on them, and they would be deported after they served their sentences. (Id. at 23.)

Kies testified that she sent no further written correspondence to defendant between March 21, 2005, and May 13, 2005, the date defendant entered her plea. (Id. at 24-25.) Kies testified that Darwish called her on March 23, 2005, indicating that defendant had received the letters and was considering the plea agreement. (Id. at 25.)

Kies testified that she left a message for Attorney Straub on April 22, 2005, and they were able to speak on April 26, 2005. (Id. at 26.) Straub explained that fraud is an aggravated felony, and that deportation was likely. Kies asked Straub to review the plea agreement, which he did, advising Kies in a May 5, 2005 e-mail that because the case involved fraud of greater than $10,000 defendant would have no defense to deportation if she entered a plea. (Id. at 26-27, 29; Ex. 1003.) After she received the e-mail, Kies called Darwish and explained the content of the e-mail to him; he was to transmit that information to defendant. (Tr. at 27-28, 29.)[2] Kies produced a note from her file confirming the call. (Tr. at 30.) The note stated: "Call Hassan. 5/5/5. Tell Fawziyeh re: Straub's e-mail." (Ex. 1008.)[3] Kies testified that she did not forward a copy of Straub's e-mail to defendant, noting that defendant was coming to Milwaukee within the next week. (Tr. at 31.) She stated that she had the e-mail available during her review of

---

[2]Kies also learned from Attorney Hunt on April 26, 2005, that the entry of a plea could lead to defendant's removal from the country, as fraud over $10,000 is a deportable offense. Kies conveyed that information the same day to Darwish, at the same time she conveyed Straub's initial advice. (Id. at 28.) On May 5, 2005, Kies also spoke to Attorney Harold Block, and he stated that convictions for fraud exceeding $10,000 will get you deported. (Id. at 28-29.) However, Kies did not pass the information from Block along to Darwish. (Id. at 29.)

[3]Kies explained that this note referred to something she did, not something she intended or ought to do. (Tr. at 46.)

the plea agreement with defendant.  (Id. at 31.)

Kies testified that the evidence against defendant was strong.  Although the government did not have a confession from defendant, defendant was present when a search warrant was executed at Manasrah's apartment.  In the apartment, the government found lots of coupons, scissors, weighing scales, and uncut inserts from newspapers containing coupons.  (Id. at 31-32.)  The government also recorded phone conversations between co-actors.  In one particular call between Jebara (the head of the scheme) and defendant, Jebara indicated that a co-actor named Medre would make delivery of coupon inserts to the apartment, and defendant said "something to the effect of that was good; the coupons this past week were gold."  (Id. at 32.) Kies explained that there were other phone conversations where they were arranging payment and arranging exchange of the coupon materials.  Kies recalled another conversation where Jebara referred to defendant as "the Haja."  (Id.)  Kies explained that these conversations would have been devastating to defendant had she gone to trial because they showed that she had taken overt acts in furtherance of the conspiracy.  (Id. at 32-33.)  Kies also knew that other co-actors were lined up to testify against defendant if she went to trial.  (Id. at 33.)

Kies acknowledged that the phone call between Jebara and defendant was placed to Manasrah's apartment, the headquarters of the cutting portion of the scheme, and the other speaker was identified as defendant because Jebara referred to her as "the Haja."  (Id. at 33-34.)  Kies also acknowledged that some of the investigative reports referred to Manasrah as the Haja.  (Id. at 34-37; Ex. 1004, 1005, 1006.)  However, Jebara explained in a later interview that he did not initially identify defendant as the Haja because she had not at that point been arrested or charged.  (Id. at 37-38; Ex. 1007.)

Kies testified that she reviewed the plea agreement with defendant at the Federal

10

Defender's office on May 12, 2005, using a court interpreter. (Tr. at 41-42.) Kies testified that, as is her typical practice, she went over the agreement paragraph by paragraph. After reading each paragraph, she stopped to discuss the contents and answer any questions. (Id. at 42.) In this case, she discussed deportation and immigration consequences with defendant in conjunction with their review of ¶ 34, which indicates that "nothing contained in this agreement is meant to limit the rights and the authority of the United States of America or any other state or local government agency to take civil, administrative, or regulatory action against the defendant." (Id. at 43; Ex. 1002 at 20-21, ¶ 34.) Kies testified that at this point she talked to defendant about the deportation issue, particularly referencing the May 5, 2005 e-mail from Straub, and explaining that nothing in the plea agreement limited the right of immigration authorities to take action against her. (Tr. at 43.) Kies also explained that Straub, the immigration lawyer, looked at the plea agreement and concluded that if defendant entered a plea she would have no defense to deportation. (Id. at 44.) Kies testified that she also read Straub's e-mail. (Id. at 45.) Kies did not recall telling defendant that the only way that she could avoid deportation for sure would be to go to trial and be acquitted, although she did recall talking to defendant about the strength of the evidence against her and the unlikelihood that she would be acquitted in this case. (Id. at 45.) Kies explained that although she had previously discussed the issue of immigration consequences, by the time she sat down with defendant face to face to review the plea agreement Straub's May 5, 2005, e-mail controlled what she said in terms of immigration consequences. (Id. at 46.) Kies further testified that the interpreter told her that defendant understood the import of Straub's e-mail. (Id. at 50.)

Kies recalled that there was initially some confusion in this case as to who was present in the Manhattan apartment cutting coupons. (Id. at 47-48.) However, Kies testified that she

11

satisfied herself that defendant was culpable as a scheme member and not just in the wrong place at the wrong time based on the things that defendant told her: specifically, defendant told Kies that she was cutting coupons. (Id. at 48.) Kies indicated that she had no concerns about whether defendant was actually involved in this offense. (Id. at 49.)

### 2. Hasaan Darwish

Hasaan Darwish testified that he is the first cousin of defendant's husband, and that after defendant was charged in this case he acted as an interpreter, passing along information. (Id. at 51.) He indicated that he speaks fluent Arabic and "fair" English. (Id. at 51-52.) He testified that he has no formal training as an interpreter. (Id. at 52.)

Darwish testified that he communicated with Attorney Kies from New York, discussing issues in defendant's case, but defendant was not present during these conversations and he did not simultaneously interpret them. (Id. at 52.) He indicated that he passed on to defendant everything Kies told him to the best of his ability and memory. (Id. at 52-53.) Kies also sent defendant letters, which he reviewed with defendant. (Id. at 53.) Darwish testified that after they received the March 14, 2005 letter transmitting the plea agreement, he called Kies on or about March 18, 2005, raising the issue of defendant's immigration status and stating that if the agreement would not cause her to be deported she may go for it. (Id. at 54.) Darwish testified that he was familiar with what had happened in Manasrah's case because he also acted as an interpreter for her. (Id. at 55.)

Darwish testified that when he raised the issue of deportation, Kies stated that she would try to work something out. Kies then sent the March 21, 2005, letter. (Id. at 55; Ex. 1001.) Darwish testified that he reviewed the letter with defendant, which he understood to say defendant could avoid deportation. (Id. at 56-57.) He further testified that it was his

12

understanding that because Manasrah was not being deported, defendant would get similar treatment. (Id. at 58-59.) He testified that Manasrah had never faced deportation, which he understood to be because she had obtained some sort of a deal with the government. (Id. at 59-60.)[4] Darwish testified that they received no further letters from Kies, and he did not recall any additional telephone calls with Kies. (Id. at 60.) He denied receiving the call from Kies where she told him that because the fraud was an aggravated felony defendant was likely to be deported and had no defense to deportation. (Id. at 60.) He also denied passing along to defendant any information that she would have no defense to deportation if she pled guilty. (Id. at 61.)

Darwish testified that deportation would be hard on his cousin (defendant's husband) because of his health problems. (Id. at 63.) He stated that the entire family was anxious that defendant not be deported. (Id.)

### 3. Defendant

The court obtained an Arabic interpreter to assist defendant at the hearing, and she testified that she speaks no English. Nevertheless, at the hearing she began answering questions in English and without using the interpreter to translate the question. (Id. at 64-66.) Her lawyer eventually asked that she "wait until the interpreter interprets the question before you answer, please." Defendant responded, in English, "I'm sorry. I'm sorry." (Id. at 66.)[5]

---

[4]Manasrah's plea agreement contains no provision precluding deportation and is in most respects the same as defendant's. (R. 499-3.) To the extent that the two agreements differ, defendant's is more favorable: the government affirmatively recommended probation for defendant, a guideline sentence for Manasrah (R. 499-3 at 16, ¶ 25); and no restitution for defendant, while Manasrah was ordered to pay $120,000 (see R. 499-3 at 17, ¶ 30; R. 305).

[5]Nevertheless, at various points she continued to answer in English. (Id. at 67, 68.) At the end of her testimony, the interpreter stated: "Your Honor, she mutters sometimes, memory

Defendant testified that she was born in Jordan on April 10, 1954. (Id. at 64-65.) She came to the United States in 1988 and lived in New York. (Id. at 65.) She testified that she could not read or write in Arabic, completed no schooling, and never had a job. (Id. at 66.) She lived with her children, who worked, and her husband. She testified that she had five children, all of whom lived in the United States. (Id.) She stated that she had no relatives in Jordan. (Id.) Defendant testified that she suffered from various medical problems in 2005 when she pled guilty, including hypertension, diabetes, stroke, and rheumatism, as well as mental issues for which she received treatment from a psychiatrist. (Id. at 67.)

Defendant testified that on the day the police raided Manasrah's house, Manasrah called her and asked her to come over because she was sick. Defendant went to Manasrah's house and saw that the police were there. (Id. at 67.) She stated that she entered the house, then took Manasrah's children, who stayed with her until Manasrah was released. (Id. at 68.) Defendant was not arrested at that time, but about two years later. (Id. at 69.) Defendant testified that after she was charged and came to Milwaukee for court in 2004, Darwish relayed information about her case. (Id.) Defendant returned to Milwaukee in May of 2005, having decided that she was going to plead guilty. (Id.)

Defense counsel asked defendant what would have been worse for her, paying restitution or being deported, and defendant responded: "Money -- Money, I don't have any resource of income to bring or bring money." (Id. at 70.) However, after further questioning, she stated, "Even if they had me thrown in the sea, that would be better than being deported."

_____

things. As I can do it, she sometimes speaks English and then switch it to Arabic. I have a hard time, and I try to explain I need everything in Arabic that would be able to help you." (Id. at 74.)

(Id.) She stated, "I don't have anybody overseas. I'm here with my kids." (Id.) She claimed that she would have been willing to risk going to jail if that was the only way to avoid being deported. (Id.) She stated that when she entered her guilty plea in this case, she did not think she could be deported, and no one told her that she would get deported. (Id. at 70-71.) She stated that she would, if deported, be living in Israel in Ramallah, with no one to help her and no ability to obtain her medications. (Id. at 71.) However, on cross-examination defendant admitted that one of her daughters lived in Ramallah. (Id. at 72.) Although her testimony was somewhat confused, she also seemed to suggest that she was not under the care of a psychiatrist in 2005, and that she used to get medication from Ramallah. (Id. at 73.)

### 4. Jonathan Nelson

Finally, Jonathan Nelson, defendant's immigration lawyer, testified that defendant was under an order of removal issued by an Immigration Judge and affirmed by the Board of Immigration Appeals; the final order of removal was pending on a petition for review to the United States Court of Appeals for the Second Circuit.[6] (Id. at 74-75.) Defendant had also filed, through counsel, a motion to reopen before the Board of Immigration Appeals, which the Board denied; defendant, acting pro se, appealed that denial to the Court of Appeals, which was also pending. (Id. at 75.) Nelson testified that defendant's current immigration situation was a direct result of her conviction in this case. (Id.)

Nelson commented on the information contained in Kies's March 21, 2005 letter regarding whether defendant had entered the country within five years of her commission of the crime. (Id. at 76.) He indicated that this did not relate to defendant's situation but rather

---

[6]After the hearing in this case, the Second Circuit denied defendant's petition for review. Masoud v. Holder, No. 11-2805, 2012 WL 2752898 (2d Cir. July 10, 2012).

to crimes involving morale turpitude, which are subject to a five-year safe harbor provision; defendant's crime was (also) an aggravated felony, making her deportable no matter when the offense was committed.  (Id. at 77.)  He therefore stated that the information in the letter about the five-year period was not accurate.  (Id.)  He testified that the statement in the letter about defendant leaving the country and not being able to return was on its face correct, but that it had no application to the question of whether her offense rendered her deportable while she remained in the United States.  (Id. at 77-78.)  He also stated that defendant would not be able to seek cancellation of removal based on the crime of conviction, an aggravated felony.  (Id. at 78.)  Nelson further testified that he had reviewed both defendant's and Manasrah's plea agreements, and neither insulated the subject from deportation.  (Id. at 78-79.)  Finally, assuming that Kies did discuss Straub's May 5, 2005 e-mail with defendant during the May 12, 2005 meeting, Nelson testified that in his opinion Kies should have made clear that her previous immigration advice was incorrect.  (Id. at 80.)  Nelson agreed that the immigration advice in Straub's e-mail was accurate.  (Id. at 82.)

## II.  DISCUSSION

### A.  Applicable Legal Standards

Coram nobis "relief is limited to (1) errors 'of the most fundamental character' that render the proceeding invalid, (2) situations where there are sound reasons for the failure to seek earlier relief, and (3) instances when the defendant continues to suffer from [her] conviction even though [s]he is out of custody."  United States v. Sloan, 505 F.3d 685, 697 (7th Cir. 2007) (quoting United States v. Morgan, 346 U.S. 502, 509 n.15 (1954)).  Motions for such relief are generally considered under the same standards as requests for habeas corpus, with the

16

showing of some substantial legal disability flowing from the conviction substituting for the "custody" requirement of § 2255. Howard v. United States, 962 F.2d 651, 653 (7th Cir. 1992). "Specifically, a petition for a writ of error coram nobis to vacate a federal conviction where the sentence has been served will not be granted unless a petitioner can show that he or she suffers from ongoing civil disabilities, or adverse collateral consequences, due to his or her allegedly wrongful conviction." Id.

I will assume that deportation qualifies as a severe collateral consequence, see Padilla, 130 S. Ct. at 1481, and that defendant provides sufficient reasons why she did not raise the issue sooner (i.e., she was unaware of the problem until immigration authorities initiated removal, and she attempted first to obtain relief through the immigration proceedings). Defendant also alleges ineffective assistance of counsel, which may constitute a fundamental defect for purposes of coram nobis relief. See, e.g., Evola v. Carbone, 365 F. Supp. 2d 592, 598 (D.N.J. 2005).

In order to establish a claim of ineffective assistance, defendant must show that (1) her attorney's performance was objectively deficient, and (2) she was prejudiced by the sub-par representation. Strickland v. Washington, 466 U.S. 668, 687 (1984). To meet the performance prong, she must establish specific acts or omissions of counsel falling outside the wide range of competent assistance under prevailing professional norms. Coleman v. United States, 318 F.3d 754, 758 (7th Cir. 2003). Judicial scrutiny of counsel's performance must be highly deferential, indulging a strong presumption of effectiveness in order to combat the distorting effects of hindsight. Atkins v. Zenk, 667 F.3d 939, 944-45 (7th Cir. 2012).

In order to establish prejudice, defendant must show that there is a reasonable probability that, but for counsel's mistakes, the result of the proceedings would have been

17

different. Strickland, 466 U.S. at 694. Because defendant's claim implicates her guilty plea, she must show a reasonable probability that, had counsel properly advised her, she would not have pleaded guilty and would have insisted on going to trial. See Hill v. Lockhart, 474 U.S. 52, 59 (1985). To make that showing, defendant must do more than simply allege that she would have insisted on going to trial; she must also come forward with objective evidence that she would not have pled guilty. Hutchings v. United States, 618 F.3d 693, 697 (7th Cir. 2010).

## B.    Analysis

### 1.    Performance

I find that Kies provided defendant with legally accurate advice regarding the immigration consequences of the plea. I credit Kies's testimony that she sought out advice from immigration specialist Straub, which she then conveyed to defendant through Darwish on May 5, 2005, and again in person on May 12, 2005. Based on her demeanor on the stand, I found Kies a highly credible witness. Her version of events is further supported by the other evidence of record, including the confirming note she placed in her file regarding the May 5, 2005 call to Darwish. I also find it highly unlikely that Kies would go to the lengths she did to obtain correct immigration information – speaking to several other lawyers and obtaining review of the proposed plea agreement by immigration specialist Straub – then fail to tell defendant what she had learned. Defendant provides no possible justification for Kies, an experienced criminal defense attorney, to behave in such a fashion. See United States v. Shipp, No. 11-CR-284, 2012 WL 2370423, at *5 (E.D. Wis. Apr. 24, 2012) ("Credibility determinations may be made on the court's assessment of the witnesses' demeanor and recollection of the events, any interest the witness has in the outcome of events, the extent to which external evidence

18

contradicts or corroborates the testimony, and the extent to which the testimony rings true in regards to reason and logic.").

Defendant and Darwish claimed that Kies failed to clearly advise defendant of the immigration consequences, but their testimony was unreliable. First, based on my evaluation of their demeanor, neither witness left me with great confidence in their credibility. Second, both had a strong incentive to deny that Kies warned defendant of deportation; defendant obviously wants very much to remain in the United States, and her relative Darwish has a motive to help her.[7] Third, defendant's hearing testimony had significant problems: Despite claiming that she spoke only Arabic, defendant repeatedly answered questions in English, without the assistance of the interpreter; she initially testified that restitution was a more important issue than deportation, reversing herself only after counsel led to her to the desired answer; and she claimed on direct examination that all of her children lived in the United States and no one would be able to help her if deported, but she was forced to admit on cross-examination that her adult daughter lived in Ramallah, the city to which she would apparently be removed, and she had previously received her medication in Ramallah. Fourth, defendant and Darwish claimed to be laboring under the impression that Manasrah received a plea deal

---

[7]Defendant notes that Darwish denied passing on the contents of the May 5, 2005 call from Kies. However, despite his denial regarding this specific call, Darwish testified generally that he passed on to defendant everything Kies told him to the best of his ability; I find that Kies made this call, consistent with her previous mode of communication with defendant, and I reject the notion that Darwish would fail to translate it for defendant. In any event, Darwish could not speak to what Kies told defendant during their May 12, 2005 meeting, even if I were to accept that he did not receive (or did not relate) the May 5, 2005 phone call. I find that Kies advised defendant of Straub's immigration advice during the May 12 meeting. Defendant also faults Kies for not sending a copy of Straub's May 5, 2005 e-mail, but Kies testified that defendant was coming to Milwaukee the following week. Because Kies would be in a position to meet defendant personally with a court interpreter, Straub's e-mail in hand, there was no reason for her to mail it.

sparing her from deportation, and that defendant was getting the same deal.  But Manasrah received no such deal; as Nelson testified, Manasrah's plea renders her just as vulnerable to deportation as defendant's; and Kies told defendant, verbally and in writing, that the government could not bind the INS.  Finally, defendant's claim at the hearing that she did not know she could be deported is flatly contradicted by her statement to the pre-sentence investigative report writer that she "worries about the outcome of this case, especially whether she will be deported."  (PSR ¶ 59.)  There would be no reason for her to make this statement had she really believed that she did not face removal or that some sort of side deal had been worked for her (as it allegedly had for Manasrah) to avoid deportation.[8]

Conceding that Straub's analysis was correct (and, ostensibly, that Kies ultimately provided this accurate information), defendant spends most of her post-hearing brief critiquing Kies's earlier communications.  For example, she notes that in the March 21, 2005, letter Kies referred to the five-year safe harbor period that applies to crimes involving moral turpitude, but not aggravated felonies.  (Defendant's crime is both.)  However, this points up only the complexity of immigration law, and the extensive efforts Kies later undertook to find the right answer.  Defendant also attacks the admittedly accurate information in the March 21 letter, such as the warning that defendant could not leave and re-enter the United States, and that while the U.S. Attorney could not bind the INS he would "work with" her.  Defendant claims that these statements misled her, but she fails to persuasively explain how this could be so.  Obviously, none of these statements amounts to a promise or guarantee, as defendant suggests.  (Def.'s Post-Hr'g Br. [R. 502] at 20.)  In any event, I find that Kies's later provision

---

[8]Defendant disclosed no such promises to the court.

of Straub's clear and succinct analysis, through a court interpreter, cleared up any possible confusion.

Relying on Nelson's testimony, defendant argues that Kies should have done more during the May 12, 2005 meeting to emphasize that her previous advice was not accurate, and that defendant should rely only on Straub's analysis. However, the court's review of a lawyer's performance is highly deferential. "The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." Harrington v. Richter, 131 S. Ct. 770, 788 (2011) (internal quote marks omitted). Defendant provides no basis for finding that Kies acted unreasonably under the circumstances. As discussed, Straub's analysis, which Kies shared with defendant at the meeting, made quite clear that defendant faced removal based on a plea to the charge. Defendant notes that she and Kies had little communication between December 2004 and May 2005, and that filtered through Darwish.[9] But Kies procured a court interpreter for the May 12, 2005 meeting, ensuring that the plea agreement was properly translated and all of defendant's questions answered. Defendant also stresses her lack of education, limited comprehension of U.S. culture, and serious health problems. But the record contains no evidence that she was unable to understand what she was doing, and, like Darwish, she was able to express herself at the hearing; her ability to respond in English, without the assistance of the interpreter, undercuts her claims in this regard. Nelson opined that defendant should have been given more time to process the information provided on May 12, but Kies relayed

---

[9]Defendant stresses that Darwish lacks formal training, but I note that he also acted as a translator in Manasrah's case, and during the hearing he had no trouble communicating in English.

Straub's analysis a week earlier (the day she got it), and defendant's plea occurred on May 13, giving her still more time to absorb the reality of her immigration situation. As noted earlier, defendant demonstrated quite clearly during her pre-sentence interview that she understood her dilemma.

Ultimately, the question before me is not whether Kies did everything possible to make sure defendant understood the collateral consequences of her plea. As the government notes, a lawyer can always do more, and it is all too easy for a defendant to come into court years later claiming confusion. Under the circumstances of this case, defendant cannot clear the "high hurdle" necessary to show deficient performance. See Griffin v. Camp, 40 F.3d 170, 173 (7th Cir. 1994).

**2.      Prejudice**

Although my conclusion that Kies provided reasonable immigration advice makes it unnecessary to go further, I also find that defendant has not established prejudice. As indicated, in order to prevail on this point defendant must show a reasonable probability that she would not have pleaded guilty and would have insisted on going to trial. While I do not doubt that deportation was a big concern for defendant, at the time she entered her plea she faced the more immediate prospect of a substantial prison sentence. The evidence against her was strong, as summarized by Attorney Kies at the hearing. Defendant was present at the coupon cutting center when it was searched by the police;[10] the government had recorded calls

_____

[10]Defendant disputes this, claiming that she arrived later to take custody of Manasrah's children. However, the only evidence of this she offers is her own self-serving testimony. See Berkey v. United States, 318 F.3d 768, 773 (7th Cir. 2003) (noting that "a self-serving statement is not enough to satisfy the second Strickland prong"). For instance, she offers no testimony from Manasrah supporting her version.

where she discussed coupon cutting with Jebara, the head of the scheme;[11] and Jebara and other scheme participants were prepared to testify against her at trial. She faced years in prison following a conviction at trial. Yet the government offered defendant a remarkably favorable plea agreement recommending straight probation and no restitution. See Miller v. Champion, 262 F.3d 1066, 1072 (10th Cir. 2001) (noting that courts often review the strength of the prosecutor's case as the best evidence of whether a defendant in fact would have changed his plea and insisted on going to trial); see also United States v. Mora-Gomez, 875 F. Supp. 1208, 1214-15 (E.D. Va.1995).

Further, even if a plea rendered defendant susceptible to removal, it was far from certain that immigration authorities would actually seek her out.[12] On the other hand, as Kies alluded at the hearing, it would have been quite likely that immigration would have placed a hold with or otherwise be notified by the Bureau of Prisons had defendant, a non-citizen, been sentenced to prison. She almost certainly would have been removed after serving a prison term. Finally, despite defendant's initial claims that all of her family lived in the United States and that she could not obtain her medicine if deported, she admitted on cross-examination that her adult

---

[11]Defendant notes the initial confusion as to the identity of "the Haja," the person who spoke with Jebara. However, by the time she entered her plea, this issue had been resolved – defendant was "the Haja." The government states that the confusion early in the case about the identity of the female at the Manhattan coupon cutting operation referred to as "the Haja" was cleared up by Manasrah, whose clarifying statements were fully corroborated by the recorded phone calls. The government explains that this information in turn led to the indictment against defendant in December 2004, almost two years after Manasrah was first charged in March 2003. The government indicates that defendant was not arrested at the time of the search warrant because the high level of her involvement in the offense did not become clear until later, after the taped conversations were more closely analyzed and other co-conspirators debriefed.

[12]Manasrah apparently remains in the United States.

daughter lived in Ramallah, and that she previously received her medication there.

Ultimately, as the government noted in an earlier submission:

It made perfect sense [for defendant] to confront the obstacles of prison and deportation one challenge at a time, especially given her family situation, having in 2005 a 12 year old daughter still living at home, a husband receiving Social Security disability payments for physical problems, and one married daughter living in Israel, whom she could presumably live with, or at least live close to, if deported.

(R. 476 at 13.)[13]

### III.  CONCLUSION

**THEREFORE, IT IS ORDERED** that defendant's petition for a writ of error coram nobis (R. 473) is **DENIED**.

Dated at Milwaukee, Wisconsin, this 13th day of July, 2012.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge

---

[13]It is worth noting that similarly-situated co-defendant Manasrah, who likewise faced difficult family circumstances and the same deportation jeopardy, also chose to plead guilty to a fraud offense rendering her defenseless to removal.